# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

THORNCREEK APARTMENTS III, LLC,   )
a foreign limited liability company,   )
D/B/A THE LOFTS AT THORNCREEK;   )
THORNCREEK MANAGEMENT, LLC,   )
a foreign limited liability company,   )
   )
       Plaintiffs,   )
   )
v.   )   2008 C 1225
   )
VILLAGE OF PARK FOREST, an   )   Honorable Judge Gary Feinerman
Illinois Municipal corporation;   )
TOM MICK, in his individual capacity   )   Consolidated with 2008 C 4303
and a Village Manager, MAE   )   and 2008 C 869
BRANDON, in her individual capacity   )   for Summary Judgment
and as Village Trustee; BONITA   )
DILLARD, in her individual capacity   )
and as Village Trustee, GARY   )
KOPYCINSKI, in his individual   )
capacity and as Village Trustee,   )
KENNETH W. KRAMER, in his   )
individual capacity and as Village   )
Trustee, ROBERT McCRAY, in   )
his individual capacity and as   )
Village Trustee; GEORGIA O'NEILL,   )
in her individual capacity and as   )
Village Trustee; LAWRENCE   )
KERESTES, in his individual   )
capacity and as Village Director of   )
Community Development; JOHN A.   )
OSTENBURG, in his individual   )
capacity and as Mayor of the   )
Village of Park Forest; SHEILA   )
McGANN, in her capacity as Village   )
Clerk only   )
   )
       Defendants.   )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIALSUMMARY JUDGMENT

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ....................................................................................ii

ARGUMENT ..........................................................................................................2

I.     THERE WAS NO DENIAL OF DUE PROCESS.................................2

II.    THERE WAS NO VIOLATION OF THE
PLAINTIFFS' RIGHT TO EQUAL
PROTECTION OF THE LAW ...........................................................6

    A.    Enactment of the electrical ordinance requiring
100 ampere service at a change of occupancy .................9

    B.    Enforcement of the electrical ordinance requiring
100 ampere service at a change of occupancy .................10

        1.    Enforcement against Thorncreek
Apartments II, LLC (Area G) ......................................10

        2.    Enforcement against Autumn Ridge
Apartments ..................................................11

    C.    Enforcement of Required Plans of Management
for Business License to Issue..............................................14

III.    THERE WAS NO REGULATORY TAKING
OF THE THORNCREEK PROPERTIES ...........................................17

    A.    Passage and enforcement of the
electrical upgrade ordinance ...............................................19

    B.    Adoption of a Strategic Plan .................................................19

    C.    Denial of a business license allegedly caused
Areas G and H to go into foreclosure..................................20

IV.    PLAINTIFFS' CONSPIRACY CLAIMS MUST FAIL..........................21

V.    PLAINTIFFS' STATE LAW CLAIMS MUST FAIL ............................22

# TABLE OF AUTHORITIES

**Cases**                                                                                          **PAGE**

*Esmail v. Macrane*, 53 F.3d 176 (7th Cir. (1995)......................................................15, 16

*Flying J v. City of New Haven* 549 F.3d 538 (7th Cir. 2008)....................................10, 13

*Hope, Inc. v. County of DuPage*, 738 F.2d 797 (7th Cir. 1983) ...............................7, 8

*Indiana State Teachers Ass'n v. Board of Sch. Comm'rs*,
101 F.3d 1179 (7th Cir. 1996) ...................................................................................15, 16

*Inn of Lamplighter, Inc. v. Kramer*, 128 Ill.App.3d 317 (4th Dist. 1984) ...................18

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470, 495 (1987) ...............................................................................................17

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)...................................17

*Muscarello v. Ogle County Bd. Of Comm'rs*,..........................................................17, 19
610 F.3d 416, 421 (7th Cir. 2010)

*Olech and Reget v. City of LaCrosse*,
595 F.3d 691, 695 (7th Cir. 2010) ............................................................................6, 16

*Peters v. Clifton*, 498 F.3d 727,733-734 (7th Cir. 2007) ..........................................18

*River Park v. City of Highland Park*,
23 F.3d 164, 167 (7th Cir. 1994) ................................................................................18

*Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) .......................................7

*Rock Energy Cooperative v. Village of Rockton*,
614 F.3d 745 (7th Cir. 2010) ......................................................................................20

*SGB Financial Services, Inc. v. Cons. City of Indianapolis-
Marion County, Indiana,* 235  F.3d 1036 (7th Cir. 2000) ..........................................19

*San Remo Hotel, L.P. v. City & County of San Francisco*,
545 U.S. 323, 345-6 (2005)...........................................................................................18

*Tuffendsam v. Dearborn County Bd. Of Health*,
385 F.3d 1124 (7th Cir. 2004) ....................................................................................6

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977) ............................................................8

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ....................................6

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) ............................................................12

*Warth v. Seldin*, 422 U.S. 490, 499 (1975)............................................................8

*Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985) ...................................................17, 18
19

*Yee v. Escondido*, 503 U.S. 519, 534 (1992) ........................................................18

## Statutes

735 ILCS 30/10-5-5 ...............................................................................................18

42 U.S.C. §1985(3) ...............................................................................................21

42 U.S.C. §1986 .....................................................................................................21

## Village of Park Forest Ordinances

Article III, Chapter 18........................................................................................3

22-38 .......................................................................................................................2

22-468 ....................................................................................................................2, 3

22-32 ......................................................................................................................2, 3

NOW COME the Defendants, VILLAGE OF PARK FOREST, an Illinois Municipal corporation, *et al.*, by and through their attorneys, HARTIGAN & O'CONNOR, P.C. and for their Response to the Thorncreek entities' ("Plaintiffs") Motion for Partial Summary Judgment, Docket Entry, ("D.E.") 140, state the following:

Before addressing the merits of Plaintiffs' Motion for Partial Summary Judgment, certain points must first be brought to the Court's attention. First, apart from the e-discovery conducted in these consolidated matters, the Defendants were first forced to dedicate an enormous amount of time and effort in responding to the Plaintiffs' Request for Production.  Plaintiffs falsely state that "[b]ased on the Village's refusal/failure to produce documents, the Plaintiffs were permitted to conduct extensive electronic discovery." (D.E. 144, pg. 2, footnote 3). To lodge such an accusation is to ignore the efforts of the Defendants in assembling and producing in excess of 10,000 paper documents. Indeed, Joint Exhibit 22 bears bates #HO (Hartigan & O'Connor – the undersigned law firm) **008562!** This is just a sampling of unsupported and simply false statements made in Plaintiffs' Memorandum of Law.

Further, after twenty-three (23) depositions[1] comprising 4,100 pages of testimony where virtually the entire Village of Park Forest was requested for deposition, Plaintiffs' Local Rule Statement of Undisputed Facts 56.1 statement cites to only eleven (11) depositions in support of their Motion for Partial Summary Judgment. The two-day deposition of Village Manager Tom Mick alone consists of 467 pages. The day-long deposition of Mayor Ostenburg is 279 pages. There is one citation to each deposition in Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts. (D.E. 141, ¶¶ 29, 47). The vast majority of Plaintiffs' undisputed facts refer to unauthenticated documents

---

[1] Defendants conducted only four of the twenty-three depositions.

containing inadmissible hearsay. While the Defendants are aware that the courts disfavor motions to strike, the considerable procedural and evidentiary issues presented in Plaintiff's Local Rule 56.1 Statement of Undisputed Facts are glaring and must be brought to this Court's attention. The Defendants respectfully request that the Court deny Plaintiffs' Motion for Partial Summary Judgment for the reasons set forth herein.

## ARGUMENT

## I.     THERE WAS NO DENIAL OF DUE PROCESS.

Plaintiffs' Memorandum opens with the argument that the Village violated its right to procedural and substantive due process. (D.E. 144, pgs. 21-25). Plaintiffs' argument in this regard is confined to the non-issuance of a business license.

As a preliminary matter, it is uncertain of what importance business licenses were to Plaintiffs.  Plaintiffs have maintained throughout this litigation and even in their Memorandum that they are exempt from the license requirement. (D.E. pg. 3, footnote 4). Their business operations were never interrupted to the extent that they could no longer do business within the Village of Park Forest ("Village"). (Def. 56.1, ¶ 67). The license only became an issue when Plaintiffs either needed to re-finance or had an interested buyer. (Def. 56.1(b)(3)(C), ¶ 7).

As Plaintiffs correctly state, Sections 22-38 and 22-468 of the Village's Code of Ordinance ("Village Code") address the issuance of business licenses. (D.E. 144, pg. 22). Plaintiffs, however, neglect to reference Section 22-32 of the Village Code, which provides the Village Manager discretion when considering an application for a business license. (Def. 56.1, ¶ 76). Section 22-32 provides:

**Sec. 22-32. Factors of consideration.**

In considering an application for a license, the village manager may consider the general welfare of the citizens, and particularly such matters as congestion and traffic on public streets and rights-of-way, adequacy of personnel to control and police the activity involved the license, the public convenience and necessity of the activity sought to be licensed, nuisances, morals, health and safety.

Further, pursuant to Section 22-468(a) of the Village Code, the applicant must submit a "plan of management." Even assuming that the plan of management is acceptable, the Village Manager is also vested with discretion, pursuant to Village Code Section 22-468(b), to determine whether the "applicant is deemed to have made a good faith effort to comply with article III of Chapter 18 and this chapter." (Def. 56.1, ¶ 78). This is the housing code that has been enforced by Defendant Larrie Kerestes for the past 25 years. (Def. 56.1(b)(3)(C), ¶3).

Plaintiffs suggest that a business license must issue if a good faith effort is put forth. (D.E. 144, pg. 23). However, as the record has shown, the Building Commissioner Kerestes and Village Manager Tom Mick have frequently requested that the Plaintiffs annual plan of management contain more information or, at a minimum, contain information dissimilar from that which was submitted the year prior. (Def. 56.1, ¶ 59). Further, Article III, Chapter 18 of the Village Code addresses housing code violations which are tied to the issuance of a business license. Indeed, Plaintiffs' 2006 business license application was denied due to numerous code violations set forth in a list attached to the denial letter. (Def. 56.1, ¶ 32).

In further support that the Village allegedly denied their right to due process, Plaintiffs' cite to a property condition report created by a "disinterested third-party." (D.E. 144, pg. 23). Notwithstanding that the report is hearsay, the code violations listed within

3

this report were limited to Area F. (Pl. 56.1, ¶¶ 25, 31). There is no question that Area F was always in better condition than its sister properties and was being dressed up for sale. (Def. 56.1(b)(3)(C), ¶9). Further, the Village Attorney never "admonished" the Village Manager to issue Area F its business license. (D.E. 144, pg. 24). Rather, he advised that the improvements to Area F showed arguable good faith. He correctly noted that Areas G and H were still not up to code. (Joint Appx. Ex. 37, pg. 4). Pursuant to the Village Attorney's advice, Village Manager Mick advised Thorncreek to submit separate applications for each area. After Thorncreek figured out that the Village wanted separate applications rather the one application on behalf of all three properties, the Village issued a license to Area F in November 2006. (Def. 56.1, ¶¶ 35-6). Area F was sold shortly thereafter for the princely sum of $16,000,000.00. (Def. 56.1, ¶ 39). Meanwhile, Areas G and H were left to rot.

Plaintiffs continuously and without support contend that the Village Manager made "demands" upon which he conditioned the issuance of a business license. In a strained effort to support that contention, Plaintiffs cite to board updates from the Village Manager to the Board of Trustees where there is no reference whatsoever to Plaintiffs' business license application. Indeed, one such update reflects the Village Manager's granting of Plaintiffs' request for more unit inspections to hopefully generate more income to improve the appearance of these three properties. (Def. 56.1, ¶¶ 21, 26). This is something that the Village had done on and off for twenty years with no success since Thorncreek never devoted enough money towards maintenance. (Def. 56.1(b)(3)(C) ¶ 4).

Plaintiffs conclude by arguing that their right to due process was violated because their residents were African-American and/or because the Village wanted to demolish these properties as part of their Strategic Plan. (D.E. 144, pgs. 24-5). With no evidence to support their due process claim, the Plaintiffs resort to using the Village's longstanding commitment to diversity, reflected in its racially diverse board and administration (Def. 56.1(b)(3)(C) ¶ 13), as a last ditch effort to show an alleged civil rights violation. Notably, a claim which being brought vicariously by four foreign limited liability corporations. Plaintiffs have no standing to raise such a claim as is discussed *infra*.

Plaintiffs' also contend that the Village's Strategic Plan was designed with Thorncreek in mind. Plaintiffs wisely neglect to reference the fact that the Strategic Plan was issued in November 2008, well after Area F sold for $16 million and the other two properties were left to rot. (Def. 56.1(b)(3)(C) ¶27). Plaintiffs' reference the Fed. R. Civ. P. 26(a)(2) report of Plaintiff's expert, Lane Kendig, which apparently described the Strategic Plan as both "illegal" and "shocking."[2] (D.E. 144, pg. 25). Plaintiffs' cite, without corresponding citation in their Local Rule 56.1 Statement of Undisputed Facts, to testimony from Diane Gormerly-Barnes of HNTB that the Strategic Plan targeted Thorncreek. *Id.* Not surprisingly, Plaintiffs neglect to mention that the Strategic Plan referred to several properties including Autumn Ridge, the "similarly situated comparator" (see *infra*) that purportedly received favorable treatment from the Village. (Def. 56.1(b)(3)(C), ¶¶28-29). Further, Gormerly-Barnes never thought that the Strategic

---

[2] There is no citation to the Rule 26(a)(2) report of Lane Kendig in Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts. Even if there were, the report itself is hearsay for the same reason that the Rule 26(a)(2) report of Terry Halverson cannot be considered in deciding this motion. (See Defendants' response to Plaintiff's Local Rule 56.1, ¶ 42).

Plan was racially motivated as the Plaintiffs insinuate. (Def. 56.1(b)(3)(C), ¶30). In short, there is simply no evidence to suggest that the Strategic Plan was in any way connected to the Plaintiffs' right to a business license.

For reasons stated both here and in the Defendants' Memorandum of Law, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment as to their Due Process claims and grant the Defendants' Motion for Summary Judgment as to Plaintiffs' Due Process claims and for such other relief as this Honorable Court deems just and proper.

## II. THERE WAS NO VIOLATION OF THE PLAINTIFFS' RIGHT TO EQUAL PROTECTION OF THE LAW.

The Supreme Court held in the case of *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), that to establish a class-of-one equal protection claim, a plaintiff must establish that (1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference in treatment. *Id.* at 564. Plaintiffs' Memorandum cites post-*Olech* decisions from this Circuit that hold that if a person is not singled out because of race or some other invidious discrimination, a plaintiff can establish an equal protection claim by presenting evidence that the defendant acted for reasons of a personal nature. Citing *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124 (7th Cir. 2004) (rejecting a claim that a county health board violated the plaintiff's right to equal protection by requiring the plaintiff and not the prior owner of the property to correct a septic tank problem) (D.E. 144, pg. 25-6).

Plaintiffs initially and correctly recognize that their Equal Protection claim is subject to "rational basis" review. Citing *Olech* and *Reget v. City of LaCrosse*, 595 F.3d 691, 695 (7th Cir. 2010). However, the Plaintiffs also ask this Court to apply "strict

scrutiny" review. Citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (D.E. 144, pg. 26).

In support of their claim of racial discrimination brought vicariously on behalf of their tenants, the Plaintiffs cite *Hope, Inc. v. County of DuPage*, 738 F.2d 797 (7th Cir. 1983). In *Hope Inc.*, the plaintiffs were ten individuals purporting to represent a class of low and moderate income persons seeking housing in DuPage County. The co-plaintiff was HOPE, Inc., a not-for-profit corporation designed to promote and locate low-income housing. Plaintiffs claimed that defendants engaged in exclusionary housing practices and a conspiracy to perpetuate discriminatory housing practices. *Id.* at 799. Plaintiffs were successful at the trial court level in obtaining a judgment and decree that the defendants "knowingly and intelligently pursued housing policies and practices which were intended to and effectively [did] exclude persons of low and moderate income and racial minorities from residing in the County." *Id.* The decree permanently enjoined the defendants from engaging in such conduct and further enjoined them from enforcing certain zoning ordinances against housing projects for people with moderate to low level incomes. In reversing the judgment and decree, the Seventh Circuit Court of Appeals held that the individual plaintiffs lacked standing because they could not show (1) that any particular project was thwarted by any wrongful conduct of the defendants such as the denial of a zoning variance of a special use permit, and (2) that they themselves would specifically benefit from the grant of the relief sought. *Id.* at 813. Further, the Seventh Circuit held that HOPE, Inc. also lacked standing in its representational capacity because it did not allege, much less prove, that any of its members or directors either suffered an injury or was threatened with immediate injury to the extent that the

member or director would be able to make out a cognizable case had he brought suit himself. Since HOPE did not demonstrate that any party that it represented as a "member" had standing, it could not have standing as that member's representative. *Id.* at 814. The Court in *Hope Inc.* also held that the district court erroneously relied upon the Supreme Court decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), in determining that there was standing. *Hope Inc.,* 738 F.2d at 812. The *Arlington Heights* decision is instructive in determining whether the Plaintiffs have standing to raise claims on behalf of their tenants. In *Arlington Heights*, the Supreme Court held that while the Metropolitan Housing Development Corporation ("MHDC") had standing to assert its *own* rights, it could not assert rights on behalf of third-person minorities:

> [I]t has been the claim that the Village's refusal to rezone discriminates against racial minorities in violation of the Fourteenth Amendment. As a corporation, MHDC has no racial identity and cannot be the direct target of the [Village's] alleged discrimination. In the ordinary case, a party is denied standing to assert the rights of third persons. *Warth v. Seldin*, 422 U.S. 490, at 499 (1975). But we need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit MHDC to assert the constitutional rights of its prospective minority tenants. (Citations omitted). For we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own. *Arlington Heights,* 429 U.S. 252, at 263-264.

The Plaintiffs, much like the MHDC, have standing to assert their own rights. However, here there is no individual plaintiff asserting violations of the Fourteenth Amendment against the Village. The four Thorncreek plaintiffs have no "racial identity" and cannot be the target of the Village's alleged discrimination. The Defendants respectfully request that this Court follow *Arlington Heights* and find that the Plaintiffs entities lack standing to assert claims on behalf of their tenants for alleged racial

discrimination. There is no basis to examine any of the Defendants' alleged actions using a strict scrutiny level of review.

The Plaintiffs had it right when they cited the rational basis level of review. (D.E. 144, pg. 25). As the Defendants understand it, the three examples of the Village's alleged violation of the Equal Protection Clause are limited to the following:

A.  Enactment of the electrical ordinance requiring 100 ampere service at a change of occupancy;

B.  Enforcement of the electrical ordinance requiring 100 ampere service at a change of occupancy; and

C.  Enforcement of required plans of management for a business license to issue. (D.E. 133, pgs. 27-33).

Each of these three purported violations are addressed in turn.

## A.  Enactment of the electrical ordinance requiring 100 ampere service at a change of occupancy

Plaintiffs contend that the Village passed the electrical ordinance requiring 100 ampere service at a change of occupancy with Thorncreek in mind. First, there is no dispute that the ordinance only impacted Area G (Thorncreek Apartments II, LLC). (Def. 56.1, ¶ 25). Plaintiffs' further assert that Defendant Building Commissioner Kerestes' use of the term "houses" in his agenda briefing to the Board of Trustees was misleading. (D.E. 144, pg. 27). There is no evidence that any of the Board members were confused by these Agenda briefings. The Board clearly understood that an electrical upgrade would be required at a change of occupancy for any residence. Indeed, on December 12, 2005, the Board voted and approved the ordinance amendment requiring 100 ampere service for any "residence" at the time of change of occupancy. (Def. 56.1, ¶¶23-24).

Plaintiffs ignore the fact that the ordinance amendment was the result of months of study and a survey of numerous neighboring municipalities. (Def. 56.1(b)(3)(C) ¶ 22). It was, and still is, the opinion of Defendant Kerestes that the older housing stock in the Village was not supplying adequate electrical service when compared to the needs of today's technology. (Def. 56.1(b)(3)(C) ¶ 23). The amendment addressed a health and safety issue for the protection of the residents of Park Forest. (Def. 56.1(b)(3)(C) ¶24). While Kerestes said that 60 ampere service it not in and of itself unsafe, you must first know how to use such service in a safe manner. *Id.*

Whether the Plaintiffs' agree or disagree with the rationale behind the amendment is irrelevant. Plaintiffs' must demonstrate that there was no rational basis for the ordinance amendment. *Flying J v. City of New Haven*, 549 F.3d 538, 547-48 (7th Cir. 2008). As the Defendants point out in their Memorandum of Law in support of their Motion for Summary Judgment, the Plaintiffs are unable show that there was no rational basis. (See D.E. 156, pgs. 15-17).

**B.    Enforcement of the electrical ordinance requiring 100 ampere service at a change of occupancy**

**1.    Enforcement against Thorncreek Apartments II, LLC (Area G)**

Plaintiffs, again without citation to the record, contend that the Village used the electrical ordinance as a basis for denial of a business license. (Plaintiffs' Memorandum, pg. 28). The record, however, indicates that in 2006 (the year that the amended ordinance was passed), the Village Manager cited a host of building code violations as a lawful basis to deny Plaintiffs' business license application. (Def. 56.1, ¶ 32).

Plaintiffs also cite to a Board Update from the Village Manager made on October 19, 2007. (D.E. 144, pg. 28). In this update, the Village Manager reported to the Board

that the Village began issuing citations to the Thorncreek townhomes for operating a leasing office without a conditional use permit and for moving occupants into Area G units that were not providing 100 ampere service. (Def. 56.1, ¶ 55). This Board Update also followed a carbon monoxide incident and concerns surrounding the lack of smoke detectors in the Thorncreek Apartments. (Def. 56.1, ¶ 55) The Village was "*considering* deeming all of area G as uninhabitable due to their failure to upgrade to electrical service." (Def. 56.1, ¶ 55) (Joint Appx. 122, specifically ¶3) (emphasis added). Notably, there is again no reference to a business license in this e-mail. Nor is there any reference to the Village refusing to grant inspections for Area G units. There is, however, reference to the Village's lawful refusal to issue certificates of occupancy to vacant units within Area G that were not providing 100 ampere service. (Def. 56.1(b)(3)(C), ¶ 32). Fines relating to these particular citations, which were thrown in the garbage by Thorncreek's management, remain in place to this day. (Def. 56.1, ¶ 65 and Joint Appx. 142, ¶ 4.03); (Def. 56.1(b)(3)(C), ¶ 12).

### 2. Enforcement against Autumn Ridge Apartments

Without citation to the record, Plaintiffs assert that "the fact that the Village did not enforce the ordinance against other properties, defeats any "safety" concerns cited by the Village." (D.E. 144, pg. 27). Again, Plaintiffs conveniently ignore the fact that the ordinance was enforced against other properties within the Village. Indeed, after this amendment passed, Autumn Ridge was forced to examine which of their units required an upgrade. (Def. 56.1(b)(3)(C) ¶ 17). Unlike the Plaintiffs who challenge ordinances by their own non-compliance, the owner of Autumn Ridge acknowledged that while

ordinances are "notable irritants," they are nevertheless a lawful exercise of a municipality's ability to legislate on behalf of its citizens. (Def. 56.1(b)(3)(C) ¶16).

In support of their contention that the Village "selectively enforced" the electrical ordinance, Plaintiffs cite to twelve (12) portions of the deposition of Andrew Brown, the owner of Autumn Ridge. (D.E. 144, pgs. 28-30). However, there is no corresponding citation to the Andrew Brown deposition in Plaintiffs' Local Rule 56.1 Statement of Undisputed Facts. (D.E. 141). In fact, there is not a single citation to the Andrew Brown deposition in Plaintiff's Local Rule 56.1 Statement of Undisputed Facts. This is a clear violation of Local Rule 56.1. Defendants respectfully request that this Court not take into consideration citations within Plaintiffs' Memorandum not otherwise cited within their Local Rule 56.1 Statement of Undisputed Facts. By not properly citing testimony pursuant to Local Rule 56.1, the Defendants are deprived of the opportunity to either admit or deny the proposed undisputed fact. The obligation set forth in Local Rule 56.1. "is not a mere formality." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994).

Even if the Court were to take the testimony of Andrew Brown into consideration, it does not support the contention that the ordinance was not enforced against Autumn Ridge. As a preliminary matter, as the name itself would imply, the Autumn Ridge apartments are not "similarly situated" to the Thorncreek Townhomes in all material respects. (See Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, D.E. 156, pgs. 12-13). Further, townhome units within Autumn Ridge were *already* providing 100 ampere service – there was no reason to enforce the ordinance against it. (Def. 56.1, ¶ 71). As for the Autumn Ridge mid-rise apartments

(totally dissimilar to the Thorncreek townhomes) that did not provide 100 ampere service, if there was no change in occupancy, then the Village would not have occasion to enforce the ordinance. Even if there was a change of occupancy calling for a certificate of occupancy, the fact that Andrew Brown testified that the ordinance was economically burdensome suggests that it <u>was</u> enforced against them. (Def. 56.1, ¶ 72).

Thorncreek posits that it was "impossible" to upgrade the units to comply with the amended ordinance. However, Patricia Clapper boldly stated in her depositon that the electrical upgrades required by ordinance "were not necessary." (Def. 56.1, ¶ 32). This is just a flavor of the pervasive attitude that Thorncreek has taken towards Village ordinance and is, in large part, the reason that these matters are being litigated today.

Plaintiffs' conclude with the argument that "illegitimate, unequal treatment" is supported by the fact that the Village's Complaint for Injunctive Relief was dismissed and attorneys' fees were awarded. (D.E. 144, pg. 30). Plaintiffs seemingly intimate that because a complaint was filed for what the Village reasonably believed were ordinance violations, then a violation of the Fourteenth Amendment can be presumed. By that logic, whenever a local public entity pursues a property owner in state court and the property owner prevails, the door is opened for a federal civil rights lawsuit. As the Defendants maintain in their Memorandum of Law and now here, the prosecution of these local ordinance violations were nothing more than an example garden variety zoning dispute that belongs in state court. Evidently, Judge Norgle agreed when, citing *Flying J v. City of New Haven*, 549 F.3d 538 (7th Cir. 2008), which is also cited *infra*, he remanded the Village's Complaint for Injunctive Relief to state court. (2008 C 869, D.E. 56).

## C. Enforcement of Required Plans of Management for Business License to Issue

Plaintiffs conclude their argument regarding Equal Protection by citing to how their plans of management were more detailed than those submitted by Autumn Ridge. (D.E. 144, pgs. 31-32). Plaintiffs' again cite to testimony from Andrew Brown not otherwise cited in their Local Rule 56.1 statement of undisputed facts. The Defendants again request that the Court disregard any reference to the same.

Plaintiffs reference their African-American tenants and the Defendants' alleged "disdain" for them. (D.E. 144, pg. 31). Again, there is no citation to the quoted portion of yet another unsupported assertion.[3] It is difficult to reconcile how the Village could possess "disdain" for the African-American tenants of Thorncreek and not Autumn Ridge as well. Autumn Ridge is also largely African-American. (Def. 56.1(b)(3)(C) ¶¶ 18-19). With such widespread discrimination as the Thorncreek plaintiffs would have this Court believe, would not the Village also discriminate against Autumn Ridge whose tenants are also African-American? Would not Tom Mick and Larrie Kerestes, who have in no uncertain terms been characterized in Plaintiffs' Memorandum as being racist, deny Autumn Ridge's business license, certificates of occupancy, etc., as well? If anything, the Thorncreek residents have expressed their belief to the Village President that Thorncreek's owners were discriminating against them by providing sub-standard housing. (Def. 56.1(b)(3)(C), ¶ 15).

The Plaintiffs also attempt to make a case of racial discrimination based upon a fair housing ordinance that has been in effect since 1981. (Def. 56.1 (b)(3)(C), ¶ 20). The fair housing ordinance was enforced by Barbara Moore, the Village Director of

---

[3] Perhaps Plaintiffs were referring to an e-mail where the Village Manager referenced David Clapper, a Caucasian male and a non-party to these matters. (See Pl. 56.1, #49).

Community Development, who happens to be African-American. (Def. 56.1 ¶15; Def. 56.1(b)(3)(C) ¶ 21).

It is evident that the overriding claim of racial discrimination is nothing but a smokescreen meant to distract the Court's attention from a longstanding history of code violations by Plaintiffs dating back to the 1980's. (Def. 56.1, ¶ 10) (Def. 56.1(b)(3)(C) ¶ 6). Over twenty years ago, the Village sued the previous owner of Thorncreek for over 4,000 code violations which led to the properties being sold in 1989. (Def. 56.1, ¶10) (Def. 56.1(b)(3)(C) ¶ 2). Further, these properties have been losing money (at least according to its principals) well before Village Manager Mick took office. (Def. 56.1(b)(3)(C) ¶ 1). The Plaintiffs declared bankruptcy in the mid-1990's and have themselves recognized problems with renting to marginally qualified residents. (Def. 56.1, ¶ 17): (Def. 56.1(b)(3)(C) ¶ 1). The Village has dedicated a considerable amount of its limited resources and time trying to make these properties both livable and attractive for its residents. (Def. 56.1(b)(3)(C), ¶¶ 10, 11, 14).

Plaintiffs make passing reference to this Circuit's decisions of *Esmail v. Macrane*, 53 F.3d 176 (7th Cir. 1995) and *Indiana State Teachers Ass'n v. Board of Sch. Comm'rs*, 101 F.3d 1179 (7th Cir. 1996), both of which were decided on the pleadings. Neither decision supports the Plaintiffs' motion as explained below.

The *Esmail v. Macrane* case involved an individual who alleged that the mayor picked on him "out of sheer vindictiveness" by denying his liquor license. *Id* .at 178. The Seventh Circuit rejected the defendants' argument that it was simply a case of selective prosecution. *Id.* In particular, the plaintiff was not complaining merely that other licensees were treated more leniently, but that there "was an orchestrated campaign of

15

official harassment directed against him out of sheer malice." *Id.* at 179. Finding that the complaint stated a claim, the Court reversed the district court's granting of defendant's motion to dismiss. *Id.* at 180.[4]

Unlike the plaintiff in *Esmail*, the Plaintiffs *are* complaining that the Village was too lenient in enforcing certain ordinances against other similarly situated entities. Indeed, their brief cites *Reget* (cited *supra*) in support of their claim of "selective enforcement in the equal protection context." (D.E. 144, pg. 26).

In the *Indiana State Teachers v. Board of Sch. Comm'rs* case*,* the Seventh Circuit held that the pleadings did not support a claim for equal protection. 101 F.3d 1179, at 1181. In Circuit Court Judge Richard Posner's decision affirming the district court, he wrote that "the concept of equal protection is trivialized when it is used to subject every decision made by state or local government to constitutional review by federal courts." *Id.* at 1181. The Seventh Circuit further held that the plaintiff failed to "clear the first hurdle, that of alleging that winner and loser are identically situated in all relevant respects." *Id.* at 1182. Of course, the Defendants raise the same points in their Memorandum of Law in Support of Their Motion Summary Judgment, namely that these matters do not belong in federal court and that the Plaintiffs have failed to demonstrate that Autumn Ridge is identically situated in all material respects. (D.E. 156, pgs. 5-18).

For the reasons stated both here and in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment as to their Equal Protection claim and grant the Defendants' Motion for Summary Judgment as to

---

[4] Seven months after the *Esmail* decision, summary judgment was granted by Judge Nordberg. 1995 WL 692023 (N.D. Ill. Nov. 16, 1995). Paul Stephanides, who is co-counsel for the Village defendants in these matters, was counsel of record for the defendants in the *Esmail* matter.

Plaintiffs' Equal Protection claim and for such other relief as this Honorable Court deems just and proper.

### III. THERE WAS NO REGULATORY TAKING OF THE THORNCREEK PROPERTIES.

Defendants addressed Plaintiffs' takings and land use claims in their Memorandum of Law in Support of Summary Judgment. (D.E. 156, pgs. 26-30). However, to the extent that Plaintiffs' cite precedents that purportedly support their claim of a regulatory taking, the Defendants address them below.

Aside from citing principles of law taken from the United States Supreme Court decisions in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) and *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987), Plaintiffs cite the Seventh Circuit's recent decision *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d 416, 421 (7th Cir. 2010).[5]

In *Muscarello*, the plaintiff opposed a proposed wind-farm that was to be built upon land adjacent to hers. After voicing her objections to the proposal, the plaintiff filed suit in federal court where "a garden variety zoning dispute morphed into a federal case against 42 defendants..." *Id.* at 418. The District Court dismissed the complaint finding that federal court was not the proper forum for her claims. *Id.* The District Court also found that the Equal Protection claim was nothing more than "a takings claim in disguise" which had to meet the ripeness requirement set forth in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985). *Id.* at 423. The due process claim was similarly dismissed because even assuming that she had a property interest, the "process due in a zoning case is minimal and normally must be

---

[5] Defendants also cite the *Muscarello* decision in their Memorandum of Law. (D.E. 156, pg. 29).

pursued in state courts." *Id.* at 423 (citing *River Park v City of Highland Park*, 23 F.3d 164, at 167 (7th Cir. 1994).

The Seventh Circuit affirmed and held that "in order to qualify as a regulatory taking, the measure must place such onerous restrictions on land as to render it useless." *Id.* at 421. The plaintiff's claim was not ripe for adjudication under the Supreme Court's holding in *Williamson County Regional Planning Commission v. Hamilton Bank. Id.* at 422. Further, neither of the two recognized exceptions to the requirements of *Williamson* saved her claim. Pre-enforcement facial challenges to the constitutionality of a law under the Takings Clause are not subject to the exhaustion requirement. See *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 345-6 (2005)(citing *Yee v. Escondido*, 503 U.S. 519, 534 (1992). This exception did not apply because the plaintiff focused on the economic deprivation that she would suffer if and when a taking occurred ("as applied"). *Id.* The second exception to *Williamson* applies only if state law does not provide relief. Likewise, this exception did not apply because the Seventh Circuit found that Illinois provided ample process for someone seeking just compensation. *Id.* at 422 (citing *Peters v. Clifton*, 498 F.3d 727, 733-734 (7th Cir. 2007); (see also 735 ILCS 30/10-5-5 (providing a statutory basis for inverse condemnation actions under Illinois law); *Inn of Lamplighter, Inc. v. Kramer*, 128 Ill.App.3d 317 (4th Dist. 1984) (noting that plaintiffs properly sought a writ of mandamus to compel an eminent domain action to compensate them for their alleged loss)).

As the Defendants understand it, Plaintiff base their regulatory takings claim upon three distinct acts:

     A.     Passage and enforcement of the electrical upgrade ordinance;

B.      Adoption of a Strategic Plan; and

C.      Denial of a business license caused Areas G and H to go into foreclosure. (Plaintiffs' Memorandum, pgs. 33-34).

Each of the purported examples of regulatory taking are addressed in turn.

### A.      Passage and enforcement of the electrical upgrade ordinance

The electrical ordinance became effective on January 1, 2006. (Def. 56.1, ¶ 24). The Plaintiffs did not bring a pre-enforcement challenge to the ordinance thereby eliminating the first exception to *Williamson*, particular for Area G, which was the only phase effected by the ordinance.   Likewise, the second exception does not apply because, as the Seventh Circuit held in *Muscarello*, Illinois courts provide "ample process" for litigants seeking just compensation. Therefore, the ripeness doctrine bars this claim.

Even if the claim is ripe for adjudication, there is no evidence that the enforcement of the electrical ordinance caused Area G to go into foreclosure. After the electrical ordinance was enacted, occupancy rates for Area G were no different than before the ordinance was enacted. (Def. 56.1(b)(3)(C), ¶ 25). In fact, following the enactment of the ordinance in January 2006, vacancy levels in Area G went up and were as high as 95% in July 2006. (Def. 56.1(b)(3)(C), ¶ 25). There is no evidence that the ordinance deprived Area G of all beneficial use. (Def. 56.1(b)(3)(C), ¶ 25); (see also Joint Appx. Ex. 94).

### B.      Adoption of a Strategic Plan

As the Defendants' state in their Memorandum of Law in Support of their Motion for Summary Judgment, even if a strategic plan could be construed as a threat of eminent domain or condemnation, it does not amount to a taking. See *SGB Financial*

*Services, Inc. v. Cons. City of Indianapolis-Marion County, Indiana*, 235 F.3d 1036 (7th Cir. 2000) (rejecting takings claim of apartment complex placed on "acquisition list" and owner's claim that it cannot sell the complex at a profit or borrow funds to improve because potential buyers/lenders feared the city would acquire property at low price); *see also Rock Energy Cooperative v. Village of Rockton*, 614 F.3d 745 (7th Cir. 2010) (rejecting takings claim that property was likely to be taken at any moment).

Plaintiffs' claim that the Strategic Plan was designed with them in mind is nonsense. The depositions of Diane Gormerly-Barnes of HNTB (discussed *supra*) and Hildy Kingma, Village Director of Economic Development and Planning, were requested by Plaintiffs to elicit testimony on this issue. Neither deposition was cited by the Plaintiffs in support of Summary Judgment and for good reason, given that there was testimony that the Strategic Plan addressed eight areas in total. (Def. 56.1(b)(3)(C), ¶ 29). Further, the Strategic Plan that was allegedly designed to doom Thorncreek was finalized and issued in November 2008 – long after Areas G and H went into foreclosure. (Def. 56.1(b)(3)(C), ¶ 27). Finally (and fatally), there is reference within the Strategic Plan to potential re-development of Autumn Ridge, the "similarly situated comparator" that forms the basis of Plaintiffs' Equal Protection challenge. (Def. 56.1(b)(3)(C), ¶ 28); (See Joint Appx. Ex. 150, pg. 21).

### C. Denial of a business license allegedly caused Areas G and H to go into foreclosure

Plaintiffs' conclude with passing reference to the unsupported contention that the lack of a business license led to lenders not extending loans to re-finance the property. As a preliminary matter, one wonders what became of the proceeds that Area F realized following its windfall sale to AIMCO in February 2007. (Def. 56.1, ¶ 39); (Def.

56.1(b)(3)(C), ¶ 6). There is no indication that the Plaintiffs made any effort whatsoever to re-finance their loan for Areas G and H. Certainly, there is no evidence that a loan application, if made, was denied because of the Village's refusal to issue a business license. (Def. 56.1(b)(3)(C), ¶ 8). There is, however, evidence that in March 2007 (after the sale of Area F) that the re-financing loan sought by Thorncreek Apartments I, LLC (Area F) was withdrawn. (Def. 56.1 ¶ 44).

As Larrie Kerestes stated, the issue of a business license only surfaced when Thorncreek was re-financing or had an interested buyer. (Def. 56.1, ¶ 7). Indeed, when the Village issued the business license to Area F, it sold shortly thereafter. (Def. 56.1, ¶ 36) Which begs the question – if the issuance of a license meant new ownership for the Thorncreek Apartments, wouldn't the Village issue a business license without delay?

In summary, after nearly four years of litigation, there is simply no evidence that the Plaintiffs suffered any harm from the non-issuance of a business license for any one or more of the Thorncreek properties.

For reasons stated both here and in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment as to their Takings claim and grant the Defendants' Motion for Summary Judgment as to Plaintiffs' Takings claim and for such other relief as this Honorable Court deems just and proper.

## IV.    PLAINTIFFS' CONSPIRACY CLAIMS MUST FAIL.

In their Memorandum of Law in Support of their Motion for Summary Judgment, the Defendants present argument as to why the Plaintiffs' conspiracy counts premised under 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986 (Counts IV and V, respectively) cannot

stand. (D.E. 156, pgs. 18-20). The Plaintiffs confine their conspiracy theories to the alleged violation of the Equal Protection Clause. Therefore, if there was no violation of the Equal Protection Clause, then Plaintiffs' Counts IV and V must necessarily fail.

There is no merit to Plaintiffs' cursory argument that the Board of Trustees approved illegal acts committed by the Village Manager. The scant portions of the trustees depositions[6] cited do not support that contention whatsoever. The testimony taken from the deposition of Defendant, Trustee Gary Kopycinski, is not referenced in Plaintiffs' Local Rule 56.1 statement of undisputed facts. (D.E. 144, pg. 35). This is yet another Local Rule 56.1 violation. Defendants respectfully request that the Court not take into consideration citations in Plaintiffs' Memorandum not otherwise cited in Plaintiffs' Local Rule 56.1 statement of undisputed facts.

For reasons stated both here and in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment as to their conspiracy claims and grant the Defendants' Motion for Summary Judgment as to Plaintiffs' conspiracy claims and for such other relief as this Honorable Court deems just and proper.

## V. PLAINTIFFS' STATE LAW CLAIMS MUST FAIL.

In support of summary judgment as to Plaintiffs' state law claims, the facts "giving rise" to the federal claims allegedly "give rise" to the state claims. (D.E. 144, pg. 35). With nothing more than that, the Defendants rest on their argument set forth in their Memorandum of Law that Plaintiffs' state-law claims must be dismissed. (D.E. 156).

---

[6] Plaintiffs' Local Rule 56.1 of Undisputed Facts and supporting Memorandum of Law is silent as to the Defendants, Village Trustee Kenneth Kramer and Village Clerk Sheila McGann.

For reasons stated both here and in Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, the Defendants respectfully request that the Court deny Plaintiffs' Motion for Partial Summary Judgment as to their state-law claims and grant the Defendants' Motion for Summary Judgment as to Plaintiffs' state-law claims and for such other relief as this Honorable Court deems just and proper.

Respectfully submitted by,

/s/ Michael R. Hartigan
One of the Attorneys for the
Defendants, Village of Park Forest, et al.
HARTIGAN & O'CONNOR P.C.
20 N. Clark Street – Suite 1250
Chicago, Illinois 60602
Telephone:   (312)201-8880
Facsimile:     (312)201-8905
E-mail: mhartigan@hartiganlaw.com

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned, an attorney, states that on the 3rd day of October 2011, he electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification to all counsel of record.

/s/Michael R. Hartigan

One of the Attorneys for the
Defendants, Village of Park Forest, et al.
HARTIGAN & O'CONNOR P.C.
20 N. Clark Street – Suite 1250
Chicago, Illinois 60602
Telephone:   (312)201-8880
Facsimile:    (312)201-8905
E-mail: mhartigan@hartiganlaw.com