UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THORNCREEK APARTMENTS III, LLC, and THORNCREEK MANAGEMENT, LLC, | ) ) ) | |
| | ) | 08 C 1225 |
| Plaintiffs, | ) ) | |
| | ) | Judge Feinerman |
| vs. | ) ) | |
| VILLAGE OF PARK FOREST, an Illinois municipal corporation, TOM MICK, in his individual capacity and as Village Manager, MAE BRANDON, in her individual capacity and as Village Trustee, BONITA DILLARD, in her individual capacity and as Village Trustee, GARY KOPYCINSKI, in his individual capacity and as Village Trustee, KENNETH W. KRAMER, in his individual capacity and as Village Trustee, ROBERT McCRAY, in his individual capacity and as Village Trustee, GEORGIA O'NEILL, in her individual capacity and as Village Trustee, LAWRENCE KERESTES, in his individual capacity and as Village Director of Community Development, JOHN A. OSTENBURG, in his individual capacity and as Mayor of the Village of Park Forest, SHEILA McGANN, in her capacity as Village Clerk, and JOHN and JANE DOE, individual employees, offices, and/or agents of the Village of Park Forest, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Consolidated with 08 C 869 and 08 C 4303 for purposes of summary judgment |
| | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In December 2007, the Village of Park Forest, Illinois, brought suit against Thorncreek

Apartments II, LLC, and its management agent, Atlantic Management Corporation, in the

Circuit Court of Cook County, alleging zoning code and building code violations. After the case

was removed to federal court, Doc. 1 (08 C 869), Thorncreek Management, LLC, filed an

intervenor complaint, Doc. 69 (08 C 869), and Thorncreek II counterclaimed against the Village

and filed third-party claims against Village officials, Doc. 102 (08 C 869). In February 2008, Thorncreek Apartments III, LLC, and Thorncreek Management filed suit in federal court against the Village and its officials. Doc. 1 (08 C 1225). And in July 2008, Thorncreek Apartments I, LLC, and Thorncreek Management filed a materially identical suit in federal court. Doc. 1 (08 C 4303). For ease of reference, and unless otherwise indicated, the Thorncreek entities and Atlantic will be referred to collectively as "Thorncreek," the Village parties will be referred to collectively as "the Village," Thorncreek's claims and counterclaims will be referred to simply as "claims," and all docket entries will be to Case 08 C 1255. A two-week jury trial has been set for April 7, 2014. Doc. 189.

Thorncreek's claims against the Village, which are brought under 42 U.S.C. §§ 1981, 1983, 1985, and 1986, and Illinois law, arise from the Village's denial of Thorncreek's requests for licenses to operate a multifamily dwelling, denial of "certificates of occupancy" required to house new tenants, promulgation and allegedly discriminatory enforcement of an electricity ordinance, and denial of a conditional use permit for Thorncreek's leasing office. Put simply, Thorncreek alleges that the Village targeted it because the vast majority of its tenants were African-American. Now before the court are the Village's motion for summary judgment, Doc. 142, and Thorncreek's motion for partial summary judgment as to liability, Doc. 140. By agreement of the parties, the summary judgment proceedings in all three cases (08 C 869, 08 C 1225, and 08 C 4303) have been consolidated for decision in 08 C 1225 before the undersigned judge. For the following reasons, Thorncreek's motion is denied, and the Village's motion is granted in part and denied in part.

## Background

"With cross summary judgment motions, [the court] construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (internal quotation marks omitted). Because Thorncreek's motion will be denied summarily and only the Village's motion will be considered on the merits, the following sets forth the material facts as favorably to Thorncreek as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Mays v. BNSF Ry. Co.*, 2013 WL 4804839, at *1 (N.D. Ill. Sept. 9, 2013). That the court at this juncture must assume the truth of those facts should not be taken as an endorsement thereof. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

### A.    The Parties

The Village is a municipality in Illinois. Lawrence Kerestes has been the Village Building Commissioner since 1984 and Director of Community Development since 2004. Tom Mick has been the Village Manager since January 2005. Mae Brandon, Bonita Dillard, Gary Kopycinski, Kenneth W. Kramer, Robert McCray, and Georgia O'Neill are Village Trustees. John A. Ostenburg has been the Village President since 1999. Sheila McGann is the Village Clerk. Thorncreek is a limited liability company that at all relevant times owned and operated a complex of rental townhomes in Park Forest; the complex includes 632 units and is divided into sectors commonly known as Areas F, G, and H. David Clapper is a principal of Thorncreek, and Pat Clapper works for Thorncreek.

### B.     The Village Code

Thorncreek has from time to time applied under the Village Code for licenses to operate multifamily dwellings in the Village.  Section 22-468(a) of the Code states that the "applicant shall be required to demonstrate the applicant's qualifications … either by previous or other experiences or by submitting a plan of management and operation to be approved by the village building commissioner."  Doc. 157-5 at 76.  Section 22-468(b) states that the Village Manager shall review each application and that where the "application [is] for a renewal of a license," the renewal shall be issued if "the applicant is deemed to have made a good faith effort to comply with" the Code.  *Ibid*.  Section 22-469 states that "renewal [of such licenses] is required on an annual basis."  *Ibid*.  Section 22-472 provides that multifamily dwelling license applications must "set forth the race, sex, marital status, age or national origin of the occupants of the rental units."  *Id*. at 77.  Mick, the Village Manager, typically would delegate the review of such applications to other departments.  Doc. 150-5 at 44.

Section 18-255 of the Code provides that a dwelling unit may not be occupied until the Building Commissioner issues a certificate of occupancy for the unit.  Doc. 149-1 at 31.  The Commissioner issues certificates of occupancy after the Commissioner or a designee inspects dwellings to ensure that there are no Code violations.  *Ibid*.  A temporary certificate may be issued if the inspection reveals violations, provided that the unit's owner takes steps to ensure abatement of the violations.  *Id*. at 32.

### C.     Events in 2005

The Village began to focus on Thorncreek in 2005, when 90-95% of Thorncreek's residents were African-American.  The Village disliked the predominantly African-American

makeup of Thorncreek and wanted to reduce the number of African-American residents. According to testimony from Kerestes, the Building Commissioner, the Village was concerned that Thorncreek's racial makeup was "highly skewed," believed that there were "too many blacks living in Thorncreek Apartments as opposed to the rest of the community," and preferred that there be "fewer black people" at Thorncreek. Doc. 150-7 at 39-40.

On September 16, 2005, Mick emailed the Trustees about a meeting with Thorncreek representatives at which he had conveyed his "feelings about the … quality of [Thorncreek's] tenants" and asserted that the "tenants [are] draining our community's businesses, schools and local government services." Doc. 157-1 at 16-17. Three months earlier, Mick had emailed the Trustees and Ostenburg, the Village President, to say that a recent court ruling "might [be] another tool in our arsenal if we can't convince [David] Clapper nicely to part with his property." *Id*. at 14. On September 30, 2005, Mick's assistant wrote a memorandum to Mick stating in relevant part: "Staff met with management … from Thorn Creek Townhouses to offer suggestions … that will enable them to attract a more diverse resident base." *Id*. at 31. On October 4, 2005, Mick reported to the Trustees that Thorncreek was taking steps to "diversify [its] tenant base" by arranging to advertise in a Hispanic-edition magazine. Doc. 151-10 at 2.

The Village routinely cited minor or manufactured infractions during unit inspections at Thorncreek as grounds for not issuing certificates of occupancy. Inspectors scratched varnish and claimed there was flaking, pulled a toilet from the wall, cited units as having inoperable furnaces without conducting testing, and kicked bricks to crumble mortar. The Village's Chief Building Inspector denied certificates of occupancy on the ground that certain trees on the property were diseased or dead.

Thorncreek submitted its license renewal application for 2005 without providing demographic information about its tenants. On March 24, 2005, Kerestes wrote to Pat Clapper expressing "serious concern" about Thorncreek operating without a business license, stating that Thorncreek's application was missing "the required Fair Housing" form and was thus incomplete, and warning that additional inspections of ready units would be contingent upon inspectors not finding any housing code violations. Doc. 157-1 at 8. Thorncreek protested that providing demographic information would violate state and federal anti-discrimination laws, but stated that it had "neither the funds nor the time to contest the ordinance," agreed to collect and provide such information, and asked that it be allowed to do so as to new residents rather than existing ones. *Id*. at 9-10. On March 31, 2005, the Village agreed to allow Thorncreek to provide the information on a rolling basis. *Id*. at 11.

On November 8, 2005, Mick emailed the Trustees and Ostenburg to report that Thorncreek had requested more inspections per week. Mick stated that he told Thorncreek that he "would like them to start leveraging other properties in their portfolio to do millions of dollars in property upgrades" and that "Village staff would be glad to bring interested developers … that would be willing to buy tracks of property." Doc. 157-1 at 38. On December 16, 2005, Mick reported to the Trustees that Thorncreek was "losing revenue with no occupancy" due to a high vacancy rate and that he had told Thorncreek that he wanted multimillion dollar property upgrades and was willing to consider providing more inspections if Thorncreek paid for them. *Id*. at 45. In the meantime, Thorncreek applied to Lehman Brothers Bank for a refinancing loan for Area F.

On December 6, 2005, Keretes advised the Trustees to pass an ordinance that would require operators of multifamily dwellings to upgrade a unit's electrical service to a minimum of 100 amperes upon a change of occupancy. Doc. 150-8 at 27-28. Kerestes told the Trustees that the ordinance was necessary to address technical and safety concerns. *Ibid.*; Doc. 150-7 at 33-34. On December 12, 2005, the Trustees enacted Ordinance No. 1835, which implemented Kerestes's recommendation. The ordinance did not affect Areas F and H, whose units all had at least 100-ampere electrical service. The units in Area G, by contrast, had 60-ampere service. In a March 2006 letter to Mick, Pat Clapper wrote: "The electrical upgrades to the 'G' Courts place a serious financial burden upon us …. To the extent the electrical upgrades can be made within each unit, we will make [them] prior to each new resident moving in." Doc. 146-9 at 3. At her deposition, Pat Clapper testified that as of 2008, Thorncreek "had not done anything with the electrical" because the upgrade "wasn't necessary" from a safety perspective. Doc. 150-3 at 33.

Another housing complex in the Village, Autumn Ridge Apartments, had 60-ampere electrical service in its 304 apartment units and 80 townhomes. The owner of Autumn Ridge, Andrew Brown, told Mick in December 2007 that compliance with Ordinance No. 1835 was "essentially economically impossible" for Autumn Ridge and that "we cannot afford to pay for compliance." Doc. 154-1 at 2. Brown stated that Autumn Ridge had a different means of providing heating and cooling to its residents and that there was no need for an electrical upgrade. *Ibid.* The Village agreed not to enforce the ordinance against Autumn Ridge for ten years to allow it to phase in the upgrades. Doc. 155-4 at 40. The agreement was made orally and informally between Brown and Mick because a formal variance from the Village "was [not] going to be forthcoming." *Ibid.* Autumn Ridge was never denied a license, even when it had not

-7-

yet complied with the electrical ordinance. *Id*. at 38. And the Village did not refuse to issue certificates of occupancy or to conduct inspections as a result of Autumn Ridge's noncompliance with the ordinance. *Id*. at 39. Thorncreek received no such exemption from the ordinance.

### D. Events in 2006 and 2007

On January 25, 2006, Thorncreek submitted one renewal application on behalf of all three properties for a 2006 multifamily dwelling license. On January 27, 2006, Kerestes wrote to Mick, stating that "it appears that we do not hav[e] any reason not to issue the license and will do so." Doc. 147-14 at 2. On March 9, 2006, Kerestes emailed Mick, reporting that Lehman Brothers had expressed its "serious concern" about the lack of a license and stating: "I have the feeling the loan is not going to be issued." Doc. 157-1 at 63.

In a March 2006 meeting with Pat Clapper, Kerestes stated that the racial profile of Areas F, G, and H changed drastically soon after it was acquired by Thorncreek. Kerestes also said that simply remedying the existing Code violations would not allow Thorncreek to obtain a 2006 business license and that the Village "wanted a plan that would include a lot more capital improvements." *Id*. at 66-67. Kerestes told Mick that he had told Thorncreek that "only after an acceptable plan has been submitted[] would the Village consider issuance of the management license." *Id*. at 68. Kerestes added: "I believe they [Thorncreek] are extremely concerned about not getting their loan." *Ibid*. (emphasis omitted). At another March 2006 meeting, Kerestes told Pat Clapper that since David Clapper had acquired Thorncreek, the racial makeup of Park Forest had changed from "58% white, 39% black" to "90% black and 10% white" and that "[a]ll this change was first observed in Thorn Creek." *Id*. at 72. Kerestes added that the improvements at Thorncreek sought by the Village would draw a "better clientele" to the complex. *Id*. at 73.

On March 14, 2006, Pat Clapper submitted a revised Management Plan for all three Thorncreek properties.  Doc. 146-9 at 2-4; Doc. 150-3 at 25.  In so doing, she stated that "[w]e have yet to receive a [2006] license or a written statement as to why we are not entitled to a license."  Doc. 146-8 at 2.

On April 19, 2006, in a letter sent by Mick and copied to Ostenburg, the Trustees, and Kerestes, the Village formally denied Thorncreek's 2006 renewal application "pending correction of the outstanding maintenance code violations that exist on the property," which were listed in an attachment to the letter.  Doc. 146-10 at 2-10.  On May 5, 2006, Pat Clapper wrote to Mick and Kerestes, asking again for a license renewal.  The letter offered to escrow 125 percent of the estimated costs of remedying the Code violations identified in Mick's letter, claimed that there were no outstanding Code violations when Thorncreek submitted its 2006 application, and stated that Lehman Brothers would provide refinancing for Area F only if Thorncreek possessed a license at the time of closing.  Doc. 157-2 at 6-7.

On May 9, 2006, Mick wrote to Ostenburg regarding the unrenewed license and a donation that Thorncreek had made to the Village, stating at one point: "Perhaps my thoughts are getting clouded with my disdain for David Clapper."  *Id*. at 11.  On June 22, 2006, the Village Attorney wrote to Kerestes and Mick, noting that Thorncreek "arguably shows good faith to bring Area F into compliance," but that Thorncreek did not address Areas G and H and that a consolidated application had been submitted for all three areas.  *Id*. at 21.  On June 23, 2006, Mick wrote to Pat Clapper, stating that her May 5 letter was inadequate because it did not address violations in Areas G and H.  Doc. 147-1 at 2.

On October 31, 2006, Mick wrote to Pat Clapper, stating that the Village would issue a license for Area F "provided that a separate application for license is submitted for each of the three Areas." Doc. 147-2 at 2. On November 3, 2006, the Village issued Area F a 2007 license. In early 2007, Area F was sold to a third party. Doc. 159 at ¶ 39.

On January 29, 2007, copying Mick and the Village attorney, Kerestes informed Pat Clapper that Areas G and H were out of compliance because they had not submitted applications, which he said had been "sent out to" Thorncreek on November 30, 2006. Doc. 147-3 at 2. As a result, Mick stated, "the village cannot approve any Certificates of Occupancy" and "any inspections would be pointless." *Ibid*. In fact, the Village had not sent Thorncreek the application forms that Kerestes claimed were sent. Doc. 152-3 at 2; Doc. 159 at ¶ 37. Thorncreek ultimately submitted a 2007 application for Areas G and H, including a Management Plan and a Fair Housing form. Doc. 152-3 at 2. On May 7, 2007, the Chief Building Inspector emailed Kerestes to say that she recommended issuing Thorncreek a license for Area H. Doc. 157-3 at 61. Kerestes forwarded Fisher's email to Mick, noting that "[i]t appears as though Area H may be acceptable to issue the license" but that Area G had still not complied with the electrical ordinance. *Ibid*. No business license was issued for Area G or Area H.

In February 2007, Thorncreek applied for a conditional use permit to use a residential townhome located in Area G as a leasing office for Areas G and H. Doc. 147-5. In early March 2007, Kerestes requested additional information regarding plans and upgrades to the leasing office. Doc. 147-6. In late March 2007, Pat Clapper responded to the information request, stating that some upgrades would be made and that others would be made "where required." Doc. 147-7. Then, in early May 2007, Pat Clapper submitted a revised petition for a conditional

use permit.  Doc. 147-8.  On June 5, 2007, the Village Plan commission met to discuss the permit.  Doc. 153-2.  On August 31, 2007, Mick emailed the Trustees, noting that the conditional use permit was scheduled for consideration at a September 4 board meeting, and stating that the petition could be denied for any of several reasons.  Doc. 153-4.  At the September 4 meeting, Ostenburg noted that there was little, if any, support for the conditional use permit and that the item would not be placed on the agenda at a subsequent meeting.  Doc. 153-5.

### E.     Events in 2008

In an email to the Trustees on February 22, 2008, Mick reported that Thorncreek was trying to sell Area H and remarked: "It is my hope that they are successful in their endeavor. Perhaps the Village's collective efforts (Troubled Building and Property Task Force, citing them, pursuing action in local court, denying their Business Office relocation into the G-Courts, cutting off change of occupancy inspections in the G-Courts due to no updating of electrical service to 100 AMP service, etc.) are beginning to have the desired effect we were seeking.  That is, we hope to find as many ways as possible to help them see that their business practices are neither appreciated by the Village and the residents as a whole nor are we willing to stand idly by and let them continue to be a drain on our community."  Doc. 151-6 at 3-4.  The same day, Mick wrote an email to the Village Police Chief regarding search warrants executed at Thorncreek units and whether Thorncreek had conducted criminal background checks on the residents involved.  Mick asked Fleming whether he could share details on the individuals involved with Thorncreek, stating: "I enjoy shoving it up their ass in a firm but diplomatic and professional manner."  Doc. 151-8 at 2.

In April 2008, Thorncreek's lenders foreclosed on Areas G and H.  Doc. 157-9.

-11-

**Discussion**

I.      **Thorncreek's Summary Judgment Motion**

Thorncreek's brief in support of its summary judgment motion, Doc. 144, cites to raw record materials rather than to its Local Rule 56.1(a)(3) statement, Doc. 141. It has long and repeatedly been held that this practice violates Local Rule 56.1. *See Jacobeit v. Rich Twp. High Sch. Dist. 227*, 2012 WL 1044509, at *2 (N.D. Ill. Mar. 28, 2012); *Loop Paper Recycling, Inc. v. JC Horizon Ltd.*, 2011 WL 3704954, at *5 n.8 (N.D. Ill. Aug. 17, 2011); *BI3, Inc. v. Hamor*, 2011 WL 1231156, at *2 (N.D. Ill. Mar. 30, 2011); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("facts are properly presented through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material"); *Daoust v. Abbott Labs.*, 2006 WL 2711844, at *4 (N.D. Ill. Sept. 19, 2006) ("Citing directly to the record in the memorandum statement of facts, as [the movant] does here, rather than citing to its 56.1(a)(3) statement, negates the purpose of the summary judgment exercise."); *Alvi v. Metro. Water Reclamation Dist. of Greater Chi.*, 2006 WL 1762032, at *2 (N.D. Ill. June 23, 2006) ("Mr. Alvi's response memorandum is written without ever referencing the Rule 56.1 factual filings, and instead improperly cites to raw discovery record material. This citation practice is materially improper."); *Madaffari v. Metrocall Cos. Grp. Policy GL*, 2005 WL 1458071, at *1 (N.D. Ill. June 15, 2005) ("when citing to the record in their legal memoranda, parties are required to cite to the numbered paragraphs of their Local Rule 56.1 statements and not to the underlying parts of the record"); *Ciesielski v. Hooters of Am., Inc.*, 2004 WL 1699020, at *1 (N.D. Ill. July 28, 2004) ("In their summary judgment briefs, both parties cited directly to the record rather than to their Rule 56.1 statements. This blatant violation of the Local Rules is

-12-

improper."); *Denari v. Genesis Ins. Co.*, 2003 WL 22964371, at *1 n.3 (N.D. Ill. Dec.15, 2003)

("The Court further notes that in his memorandum of law, Denari cites directly to the record

rather than to his Rule 56.1 statement.  This is improper.") (citation omitted); *Malec v. Sanford*,

191 F.R.D. 581, 586 (N.D. Ill. 2000) ("[c]itations in the fact section should be to the 56.1(a) or

(b) statement of facts only, … [not] directly to pieces of the record").

A party moving for summary judgment cannot expect its motion to be granted if it fails

in a significant respect to comply with the rules.  Thorncreek's motion accordingly is denied due

to its violation of Local Rule 56.1.  *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th

Cir. 2005) ("[w]e have … repeatedly held that a district court is entitled to expect strict

compliance with [Local] Rule 56.1") (internal quotation marks omitted, brackets in original);

*Jacobeit*, 2012 WL 1044509, at *2 (denying the defendant's summary judgment motion because

its brief cited to raw record materials rather than to its Local Rule 56.1(a)(3) statement); *Jorden

v. United States*, 2011 WL 4808165, at *1 (N.D. Ill. Oct. 11, 2011) (same); *Sledge v. Bellwood

Sch. Dist. 88*, 2011 WL 2457920, at *2 (N.D. Ill. June 17, 2011) (denying a summary judgment

motion due in part to the movant's violation of Local Rule 56.1); *Eva's Bridal Ltd. v. Halanick

Enters., Inc.*, 2010 WL 2035720, at *5 (N.D. Ill. May 19, 2010) ("Failure to comply with Local

Rule 56.1 is grounds for denial of a summary judgment motion.").  The motion would have been

denied even if Thorncreek had complied with Local Rule 56.1, as the record viewed in the light

most favorable to the Village would not permit the entry of summary judgment in Thorncreek's

favor on any of its claims.

**II.      The Village's Summary Judgment Motion**

The Village's summary judgment papers comply with Local Rule 56.1 and thus will be addressed on the merits.

> **A.      Equal Protection, §§ 1985 and 1986, and Illinois Civil Right Act Claims (Counts I, IV, V, VI, VIII)**

Thorncreek alleges that by taking the actions described above, the Village violated Thorncreek's right to equal protection under the Fourteenth Amendment of the United States Constitution and article I, § 2, of the Illinois Constitution; engaged in a conspiracy to deprive Thorncreek of its federal equal protection rights, in violation of 42 U.S.C. § 1985(3); wrongfully refused to prevent a § 1985 violation, in violation of 42 U.S.C. § 1986; and violated the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/1 *et seq*.  Doc. 17 at ¶¶ 127-144, 184-203, 208-212.  The claims are considered in turn.

> **1.      Fourteenth Amendment Equal Protection Claim**

Typically, "an equal protection violation occurs when a regulation draws distinctions among people based on a person's membership in a 'suspect' class.  Suspect classes include race, alienage, and national origin." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) (internal citation omitted).  An equal protection claim also may be pursued under a "class-of-one" theory, "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).   The Village contends that Thorncreek cannot claim membership in a suspect class, and thus must proceed only under the class-of-one theory, because it "lack[s] standing to raise claims on [its tenants'] behalf."  Doc. 156 at 15.  If

the Village is right, Thorncreek is entitled only to rational basis review of its equal protection claim. *See Abcarian v. McDonald*, 617 F.3d 931, 938 (7th Cir. 2010).

In *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), the Supreme Court remarked that a "corporation … has no racial identity and cannot be the direct target of … alleged discrimination." *Id*. at 263. The Seventh Circuit characterized this remark as "dicta," and expressed skepticism as to its precedential value, in *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 498 n.5 (7th Cir. 1993). In so doing, the Seventh Circuit observed that *Village of Arlington Heights* (1) did not actually deny standing to the plaintiff corporation on the ground that a corporation cannot be the direct target of racial discrimination, and (2) in fact "did 'not decide whether the circumstances of this case would justify permitting [the plaintiff] to assert the constitutional rights of its prospective minority tenants' because in the case there was 'one individual plaintiff who has demonstrated standing to assert these rights as his own.'" *Ibid*. (quoting *Vill. of Arlington Heights*, 429 U.S. at 263-64) (Seventh Circuit's alterations omitted). The Seventh Circuit further observed that the D.C. Circuit in *Gersman v. Group Health Association, Inc.*, 931 F.2d 1565 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992), *reinstated*, 975 F.2d 886 (D.C. Cir. 1992), "held that a plaintiff corporation had standing to sue for injury it suffered from discrimination against it because its president and owners were Jewish" and found "as a prudential matter a corporation that is harmed by discriminatory action taken against it has standing to litigate that harm." *Triad Assocs.*, 10 F.3d at 498 n.5.

Years earlier, in *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583 (7th Cir. 1989), *abrogated on other grounds*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996),

the Seventh Circuit took note of several "post-*Arlington Heights* decisions from various circuits

which, in the absence of a definitive ruling from the Supreme Court on this issue, have held that

a corporation may have standing to allege racial discrimination." *Id*. at 591 (citing *J.A. Croson

Co. v. City of Richmond*, 822 F.2d 1355 (4th Cir. 1987), *aff'd*, 488 U.S. 469 (1989); *Marshall v.

Kleppe*, 637 F.2d 1217 (9th Cir. 1980); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671

F.2d 702 (2d Cir. 1982) (holding that a theater that hosted productions for black and Latino

communities could sue for allegedly racially motivated actions taken against it)).  Other federal

appellate decisions likewise have held that an equal protection claim lies for corporations and

individuals targeted because of their association with members of a suspect class.  *See Young

Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1039 (11th Cir. 2008) ("Young Apartments'

first cause of action alleges that [the Town of] Jupiter enacted and enforced the Overcrowding

Ordinance in order to harass landlords who provide affordable housing to Hispanic immigrants

in the Center Street area.  Although Jupiter's alleged animosity toward its Hispanic residents is

at the heart of this claim, Young Apartments seeks to remedy its own injury.  Courts have

routinely found that a business has standing to bring § 1983 claims against state officials who are

harming its business by discriminating against its customers.  This rule of law is based on the

uncontroversial principle that it is unconstitutional for a state actor, motivated by discriminatory

animus, to interfere with an individual's right to contract or associate with members of a

protected class.") (citing cases); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873

F.2d 1407, 1408 (11th Cir. 1989); *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1415 (4th Cir. 1983)

("if defendants singled Scott for disadvantageous treatment because of his willingness to house

minority tenants, then Scott in his own stead suffered injury to his right to be free from official

discrimination"); *Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 17 (1st Cir. 1979) ("[A] State may not punish a non-white for having social contacts with a black. Likewise it may not … punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has a § 1983 right of action.") (internal citations omitted); *see also Lanna Overseas Shipping v. City of Chicago*, 1997 WL 587662, at *7 (N.D. Ill. Sept. 18, 1997) (holding that § 1983 "does provide a cause of action [under the Equal Protection Clause] for an individual or corporation who is the target of discrimination because of its willingness to enter into contracts … with members of another class or group"); *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 689 (S.D.N.Y. 1996) (granting standing under § 1983 to a plaintiff who "alleg[ed] that he was singled out for disadvantageous treatment by the Village defendants[] who … selectively enforced its laws and codes because they believed [the] plaintiff was in a rental contract with or otherwise associated with his African American tenants").

In accord with this weight of authority, Thorncreek may pursue a race-based equal protection claim. This claim requires proof that the Village had a "racially discriminatory intent or purpose" to treat Thorncreek differently because its tenants were predominantly African American. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Vill. of Arlington Heights*, 429 U.S. at 265); *see also Washington v. Davis*, 426 U.S. 229, 239 (1975); *McPhaul v. Bd. of Comm'rs of Madison Cnty.*, 226 F.3d 558, 564-65 (7th Cir. 2000), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). The strict scrutiny standard applies to this claim. *See Srail*, 588 F.3d at 943.

In the equal protection section of its initial brief, the Village does not dispute that race-based equal protection claims are subject to strict scrutiny and does not contend that its actions survive strict scrutiny; rather, staking its defense on the premise that Thorncreek is limited to a class-of-one claim, the Village argues only that its actions had a rational basis. Doc. 156 at 22-35. Accordingly, the Village has forfeited for summary judgment purposes any argument that its actions could survive strict scrutiny. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on"); *Rogers v. Waukegan Pub. Sch. Dist. 60*, 924 F. Supp. 2d 940, 954 (N.D. Ill. 2013). It is true that the Village devoted two paragraphs to strict scrutiny in its reply brief, Doc. 164 at 8-10, but arguments presented for the first time in a reply brief are forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("the district court is entitled to find that an argument raised for the first time in a reply brief is forfeited"); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district

-18-

court was entitled to find that Volvo waived the issue."); *Starks v. City of Waukegan*, ___ F. Supp. 2d ___, 2013 WL 2243089, at *6 (N.D. Ill. May 21, 2013). In any event, even putting aside the Village's forfeiture, the record would permit a reasonable jury to find that the Village targeted Thorncreek for selective enforcement and other mistreatment because of, and not just despite, its predominantly African-American population. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (holding that "outright racial balancing … is patently unconstitutional"); *Hearne v. Bd. of Educ. of City of Chi.*, 185 F.3d 770, 775 (7th Cir. 1999) ("the grant of a license is a particular government benefit that may not be denied … for reasons that discriminate").

As noted above, Thorncreek also pursues a class-of-one equal protection claim. The class-of-one doctrine "recognizes that the Equal Protection Clause may give[] rise to a cause of action on behalf of a 'class of one' where the plaintiff d[oes] not allege membership in a class or group *if* the plaintiff can show that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 685 (7th Cir. 2013) (quoting *Olech*, 528 U.S. at 564) (some internal quotation marks omitted) (Seventh Circuit's alterations and emphasis). "Stated differently, [the class-of-one theory] holds that the Equal Protection Clause protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Ibid.* (internal quotation marks omitted) (alterations in original).

The Village first argues that Thorncreek has failed to identify a "similarly situated" entity that received better treatment with respect to dwelling licenses and enforcement of the electricity ordinance. Doc. 156 at 21-22. Recognizing Thorncreek's position that it was similarly situated

to Autumn Ridge, the Village points to the "physical differences" between the two complexes,

noting that Autumn Ridge consists of 80 townhomes and 304 apartment units in four mid-rise

buildings, while Thorncreek consists of three complexes with 632 apartment units and no mid-

rise buildings. *Id*. at 10, 22. The Village's argument is unpersuasive. Thorncreek and Autumn

Ridge are similarly situated in all material respects; they are both large complexes with hundreds

of units, and they both are subject to the same electricity ordinance and other regulatory

requirements. *See Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) ("To achieve

clarity [in a class-of-one case], courts look to the treatment of similarly situated individuals: if all

principal characteristics of the two individuals are the same, and one received more favorable

treatment, this may show there was no proper motivation for the disparate treatment."). Because

the record would allow a reasonable jury to find that the Village enforced the electricity

ordinance with far more vigor against Thorncreek than against Autumn Ridge, Thorncreek has

established for summary judgment purposes that it was treated worse than a similarly situated

residential complex.

The Village also argues that the record indisputably establishes that it had a rational basis

for its decisions regarding Thorncreek. Doc. 156 at 22-27. The standard governing the "no

rational basis" element of class-of-one equal protection claims remains in flux in this Circuit. In

*Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), the Seventh

Circuit split three ways on that question, with no opinion garnering a majority. As a panel

recently summarized the outcome in *Del Marcelle*:

> Some members of the court thought the plaintiff should be required to plead
> and prove that the disparate treatment was motivated by personal ill will or
> other illegitimate purpose; that is, a purpose unrelated to public duty. *See
> id*. [at 889] (Posner, J.) (plurality opinion) (writing for four members of the

court).  Others expressed the view that personal animus or other improper motive is not an element of the claim but just one way to prove that the defendant's action lacked a rational basis.  *See id.* at 913-14 (Wood, J., dissenting) (writing for five members of the court). One member of the court concluded that motive or intent "has no role at all" in class-of-one litigation.  *See id.* at 900 (Easterbrook, C.J., concurring in the judgment).

*D.B. ex rel. Kurtis B.*, 725 F.3d at 685.

There is no need to choose sides here, as Thorncreek's class-of-one claim survives summary judgment even under the most stringent standard (the one set forth in Judge Posner's opinion) because the record would permit a reasonable jury to find that the Village's disparate treatment of Thorncreek was motivated by personal ill will.  Mick's emails to the Trustees revealed his desire to make David Clapper "part" with his property, expressed his "disdain" for David Clapper, and stated that he "enjoy[s] shoving it up [Thorncreek's] ass."  This evidence suggests that personal animus grounded Mick's and the Village's adverse treatment of Thorncreek and David Clapper, and thus is sufficient to establish the "no rational basis" element of Thorncreek's class-of-one claim.  *See Hanes v. Zurick*, 578 F.3d 491, 492, 494-95 (7th Cir. 2009) (refusing to dismiss a class-of-one claim alleging that the police unconstitutionally arrested only the plaintiff during disputes with his neighbor, reasoning that the plaintiff had alleged personal animus); *Mathers v. Wright*, 636 F.3d 396, 400-01 (8th Cir. 2011) (holding that the plaintiff stated a class-of-one claim because the defendant's isolation of plaintiff and refusal to teach her was alleged to have been motivated by personal animus).

Accordingly, the class-of-one claim survives summary judgment.  In closing, it bears mention that the Village might have argued that Thorncreek's class-of-one claim is fundamentally incompatible with its race-based equal protection claim and that Thorncreek cannot proceed with both.  *Cf. Castillo v. FBOP*, 2006 WL 1764400, at *7 (D.N.J. June 23,

2006) (stating that the plaintiff "cannot have it both ways, that is, alleging that he is a member of a suspect class and yet claiming that he is in the 'class of one'"). The merits of that argument will not be addressed because the Village did not make it, resulting in a forfeiture.

## 2. Section 1985 Claim

Section 1985(3) of Title 42 provides a cause of action to a party injured when "two or more persons … conspire … for the purpose of depriving … any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3); *see Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 469 (7th Cir. 1993). In opposing Thorncreek's § 1985 claim, the Village invokes the "intra-corporate conspiracy" doctrine. Doc. 156 at 28. The doctrine provides that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory," *Travis v. Gary Cmty. Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990), and applies with full force to government entities like the Village, *see Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994); *Allen v. City of Chicago*, 828 F. Supp. 543, 564 (N.D. Ill. 1993) ("both [the mayor and the commissioner] and the unnamed city aldermen are members of the same municipal corporation, *i.e.*, the City of Chicago"). Thorncreek implicitly concedes that Defendants are all part of the same municipal corporation, but seeks refuge in two recognized exceptions to the doctrine. Doc. 160 at 27-28. Those exceptions apply: (1) where "corporate employees are shown to have been motivated solely by personal bias"; and (2) when there exists an "extensive discriminatory conspiracy" that "was part of some broader discriminatory pattern … permeat[ing] the ranks of the organization's employees." *Hartman*, 4 F.3d at 470-71.

-22-

The record would permit a reasonable jury to find that the second exception applies. Viewed with all factual disputes resolved and inferences drawn in Thorncreek's favor, the record shows that the Village was displeased with the number of African-Americans residents at Thorncreek and responded with actions designed to disfavor Thorncreek. Those actions were committed and approved by numerous Village officials, including Mick, Kerestes, Ostenburg, the inspectors, and the Trustees. This fact pattern qualifies as an "extensive discriminatory conspiracy" that "permeat[ed] the ranks of the [Village's] employees." *Ibid.*; *see Doe 20 v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 5*, 680 F. Supp. 2d 957, 980-81 (C.D. Ill. 2010) (holding that the second exception was satisfied where the plaintiff alleged that "[s]chool Administrators conspired with White to conceal White's misconduct by, among other actions, not reporting the complaints against him, failing to document the nature and extent of his misconduct in his personnel file, and keeping the nature and extent of White's misconduct a secret"); *Barner v. City of Harvey*, 1996 WL 199745, at *6 (N.D. Ill. Apr. 23, 1996) (same where the defendants were alleged to have "agreed explicitly and implicitly and conspired to deprive Plaintiffs of their rights to free speech and association, due process, and equal protection of the laws" and to have "understood the general objectives of the scheme, accepted them, and agreed to do their part to further them"). Accordingly, the § 1985 claim may proceed.

### 3.     Section 1986 Claim

Section 1986 of Title 42 "creates a cause of action against a person that neglects or refuses to stop a conspiracy to violate the civil rights of a member of a protected class. An action under § 1986 only lies where a defendant has violated § 1985(3), which prohibits a conspiracy to interfere with one's civil rights." *Malone v. Am. Friends Serv. Comm.*, 213 F.

-23-

App'x 490, 494 (7th Cir. 2007) (citation omitted). The Village's only argument for summary judgment on the § 1986 claim is that Thorncreek has no viable federal equal protection claim or § 1985 claim. Doc. 156 at 29. Because Thorncreek's federal equal protection and § 1985 claims survive summary judgment, the Village's argument fails.

### 4.    Illinois Equal Protection Claim

The Village argues that because equal protection claims under the Illinois Constitution are governed by the same standard as federal equal protection claims, and because Thorncreek's federal equal protection claims are meritless, summary judgment should be granted on the Thorncreek's Illinois equal protection claims as well. Doc. 156 at 27. Illinois equal protection claims generally are governed by the same standard as federal equal protection claims, *see Jarabe v. Indus. Comm'n*, 666 N.E.2d 1, 3 (Ill. 1996) ("This court uses the same analysis in assessing equal protection claims under both the federal and the state Constitutions."), though the Supreme Court of Illinois recently suggested that the state equal protection clause may be more expansive than its federal counterpart, *see Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 764-65 (Ill. 2013). Accordingly, because Thorncreek's federal equal protection claims survive summary judgment, so do the Illinois claims.

### 5.    ICRA Claim

The ICRA provides in relevant part that "[n]o unit of State, county, or local government in Illinois shall … subject a person to discrimination … on the grounds of that person's race." 740 ILCS 23/5(a)(1); *see Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (holding that the ICRA "merely created a new venue in which plaintiffs could pursue … discrimination actions that had been available to them in the federal courts") (quoting *Ill. Native Am. Bar Ass'n*

-24-

*v. Univ. of Ill. Bd. of Trs.*, 856 N.E.2d 460, 467 (Ill. App. 2006)).  The Village argues that the individual defendants may not be held liable under the ICRA because the statute applies only to a "unit of … local government."  Doc. 156 at 43-44.  Thorncreek does not respond to this argument, Doc. 160 at 38-39, thus forfeiting the point.  *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407 (7th Cir. 2007) ("We agree with the district court's determination that [the plaintiff] waived (forfeited would be the better term) his discrimination claim by devoting only a skeletal argument in response to Cracker Barrel's motion for summary judgment."), *aff'd on other grounds*, 553 U.S. 442 (2008).  The Village's argument is correct on the merits in any event.  *See Neuman v. United States*, 2007 WL 3407442, at *3 (S.D. Ill. Nov. 15, 2007) (ICRA "provides a cause of action against only three potential parties: the State of Illinois, its counties, and its local governments").  Accordingly, the ICRA claim may proceed only against the Village.

The Village also argues that Thorncreek cannot pursue an ICRA claim because it is not a "person" within the meaning of the statute.  Doc. 156 at 44.  The Village states the argument without offering any support, and thus must be understood to have incorporated by reference the "standing" argument it made in opposition to Thorncreek's race-based equal protection claim.  That argument fails for the reasons set forth in Section II.A.1, *supra*.

## B.    Due Process and Takings Claims (Counts II, III, VII, IX)

Thorncreek also alleges that the Village's use of its regulatory apparatus to interfere with Thorncreek's use of its land and property violated the substantive and procedural due process guarantees of the Fourteenth Amendment of the United States Constitution and article I, § 2, of

the Illinois Constitution, and the Takings Clauses of the Fifth Amendment (as incorporated by

the Fourteenth Amendment) of the United States Constitution and article I, § 15, of the Illinois

Constitution. Doc. 17 at ¶¶ 145-183, 204-207, 213-221. The Village seeks summary judgment

under the ripeness doctrine set forth in *Williamson County Regional Planning Commission v.*

*Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), arguing that Thorncreek has not sought

and been denied compensation at the state level. Doc. 156 at 29-30, 36-38. Because the Village

is right that *Williamson County* bars Thorncreek's takings and due process claims, there is no

need to reach the Village's merits arguments on those claims, *id.* at 30-35, 38-39.

In *Williamson County*, "the Supreme Court articulated a special ripeness doctrine for

constitutional property rights claims which precludes federal courts from adjudicating land use

disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive

decision, and (2) the property owner exhausts available state remedies for compensation."

*Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 422 (7th Cir. 2010) (quoting *Forseth v.*

*Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000)); *see also Gamble v. Eau Claire Cnty.*, 5 F.3d

285, 286 (7th Cir. 1993) ("the landowner cannot complain that his constitutional right has been

denied until he exhausts his remedies for obtaining a compensation award or equivalent relief

from the state"). The doctrine applies not only to takings claims, but also to substantive and

procedural due process claims that challenge the government's regulatory interference with the

plaintiff's use of its land. *See Forseth*, 199 F.3d at 369 ("we have yet to excuse any substantive

due process claim in the land-use context from *Williamson*'s ripeness requirements"); *Hager v.*

*City of W. Peoria*, 84 F.3d 865, 869 (7th Cir. 1996) ("The exhaustion requirement of *Williamson*

*County* applies whether plaintiffs claim an uncompensated taking, inverse condemnation, or due

process violation.  That plaintiffs have sued for 'inverse condemnation' with a reference to due process, whether substantive or procedural, therefore does not alter our analysis. … [The plaintiffs] must first pursue their claims, whether in the form of a takings challenge or a due process claim, in Illinois state court.") (footnote and internal citations omitted); *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994) ("[A] property owner may not avoid *Williamson* by applying the label 'substantive due process' to the claim.  So too with the label 'procedural due process.'  Labels do not matter.  A person contending that state or local regulation of the use of land has gone overboard must repair to state court.") (citation omitted).  The doctrine also applies to state law takings and due process claims.  *See B. Willis, C.P.A., Inc. v. BNSF Ry. Corp.*, 531 F.3d 1282, 1298 n.19 (10th Cir. 2008) ("In this case, because all of Willis' federal and state claims stem from the Oklahoma eminent domain proceedings, *Williamson County*'s ripeness rule applies, requiring Willis to conclude the state condemnation proceedings before those claims will be ripe for adjudication in federal court."); *Hamed v. City of Belleville*, 2010 WL 3359460, at *4 (S.D. Ill. Aug. 23, 2010) (holding under *Williamson County* that "Plaintiff's takings claims, whether labeled as a Fifth Amendment takings claim, a state inverse condemnation claim, or a due process [claim], are not ripe for adjudication").  There is an exception to the doctrine "if state law does not provide relief," but the Seventh Circuit has held that "Illinois provides ample process for a person seeking just compensation." *Muscarello*, 610 F.3d at 422 (citing 735 ILCS 30/10-5-5).

The applicability of the *Williamson County* doctrine to Thorncreek's takings claims is beyond any reasonable dispute.  Thorncreek argues, however, that the doctrine does not apply to its due process claims because those claims "present genuine disputes as to whether the [Village]

-27-

violated [Thorncreek's] constitutional rights to follow the Village's ordinances with respect to granting business licenses—a property interest." Doc. 160 at 29. Thorncreek's description of its due process claims is accurate; the Village is alleged to have wrongfully applied its ordinances against Thorncreek, with the result that Thorncreek has been hindered in its pursuit of its residential real estate business. Yet Thorncreek's conclusion is wrong; its due process claim is precisely the sort of due process claim that falls within the scope of the *Williamson County* doctrine. *See Unity Ventures v. Lake Cnty.*, 841 F.2d 770, 774-75 (7th Cir. 1988) (holding that although the plaintiffs raised a substantive due process claim, not a takings claim, *Williamson County* still applied).

Thorncreek also contends that *Williamson County* is inapposite because no "final decision" was made by the Trustees regarding its applications, particularly its application for a conditional use permit. Doc. 160 at 29. That argument fails as well. In *River Park*, the plaintiff argued that the defendant municipality would not give it a final decision on its zoning application. 23 F.3d at 165. The Seventh Circuit held that *Williamson County* still applied, reasoning: "Illinois provided [the plaintiff] with ample means to contest the runaround it was receiving at the hands of [the municipality]. If because the City refused to make a formal decision the standard means were cut off, the common law writ of certiorari remained. The opportunity to apply for that writ is enough …." *Id*. at 167 (citing *Graff v. City of Chicago*, 9 F.3d 1309, 1323-25 (7th Cir. 1993) (en banc)); *see also Covington Ct., Ltd. v. Vill. of Oak Brook*, 77 F.3d 177, 179 (7th Cir. 1996) (same).

Finally, Thorncreek contends that in Case 08 C 869—where the Village sued Thorncreek first—Federal Rule of Civil Procedure 13(a) required Thorncreek to bring its due process and

takings claims as compulsory counterclaims. Doc. 160 at 29-30, 32. Rule 13(a) provides that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). Even if Thorncreek's due process and takings claims in Case No. 08 C 869 were compulsory counterclaims, *Williamson County* defeats them. The Rules Enabling Act provides that the Rules "shall not … modify any substantive right." 28 U.S.C. § 2072(b). *Williamson County* interprets the Fifth Amendment, and its ripeness doctrine has been described by the Seventh Circuit as implicating Article III's limits on the subject matter jurisdiction of the federal courts. *See Flying J Inc. v. City of New Haven*, 549 F.3d 538, 544 (7th Cir. 2008) ("[t]he point of *Williamson County* is that there is no case or controversy within the meaning of Article III until the plaintiff has pursued all available remedies in state court"). Accordingly, the demands of *Williamson County* could not possibly be negated where takings and due process claims otherwise within its scope are brought by a counter-plaintiff under Rule 13(a) rather than a plaintiff under Rule 7(a)(1). *See Sibbach v. Wilson & Co.*, 312 U.S. 1, 9-10 (1941) (in rejecting a constitutional challenge to Civil Rules 35 and 37, holding that "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules *not inconsistent with the* statutes or *Constitution of the United States*") (emphasis added); *cf. FDIC v. Wilson's Famous Blue Ribbon Meats, Inc.*, 835 F. Supp. 245, 246 (E.D. Pa. 1993) (dismissing a compulsory counterclaim due to the counterclaimant's failure to exhaust the administrative remedies required by statute).

### C.    *Monell* Claims Against the Village

Thorncreek seeks to hold the Village liable for the alleged misconduct of its officials under the municipal liability doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  To state a *Monell* municipal liability claim, a plaintiff must show "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (internal quotation marks omitted).  "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011).  Resolving all disputes in Thorncreek's favor, the record establishes at least the second means of showing an official policy or custom.

Although there was no explicit Village policy that only a certain proportion of African-Americans was acceptable within a given housing complex, the record allows the conclusion that there was implicit understanding in Village government that Thorncreek had too many African-Americans.  *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) ("[T]he plaintiff must demonstrate that there is a policy at issue rather than a random event.  This may take the form of an implicit policy … or a series of violations to lay the premise of deliberate indifference.") (internal quotation marks omitted).  Kerestes testified to his understanding of the Village's desire for fewer African-Americans at Thorncreek, and he told Pat Clapper the Village was requiring Thorncreek to make capital improvements in an effort to

attract non-African-American tenants. Viewing the record in the light most favorable to Thorncreek, Village officials concocted Code violations at Thorncreek to put pressure on it and David Clapper. Mick informed the Trustees that Thorncreek was taking steps to "diversify its tenant base" by advertising in a Hispanic-edition magazine. And in his email to the Trustees reporting on Thorncreek's efforts to sell Area H, Mick remarked that "[p]erhaps the Village's collective efforts … are beginning to have the desired effect we were seeking," with the effect being to convey to Thorncreek that the Village is not "willing to stand idly by and let [Thorncreek] continue to be a drain on our community." Doc. 151-6 at 3-4. This evidence is sufficient to show that the Village had "a widespread practice" of discriminating against Thorncreek due to its predominant African-American population, "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Rice ex rel. Rice*, 675 F.3d at 675; *see also Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006); *Cannon v. City and Cnty. of Denver*, 998 F.2d 867, 877-78 (10th Cir. 1993) (holding that the plaintiffs had adduced evidence that police harassed anti-abortion protesters with enough frequency to create a fact question regarding whether the alleged harassment amounted to a widespread practice under *Monell*).

### D. Defenses Asserted by the Individual Defendants

The Village asserts three defenses on behalf of the individual defendants, which are considered in turn.

### 1. Official Capacity Claims Against the Individual Defendants

First, the Village maintains that the official capacity suits against the individual defendants should be dismissed because they are redundant of the *Monell* claims against the Village. Doc. 156 at 39. The Village is correct. A suit against a municipal official in her

official capacity is the equivalent to a suit against the municipality. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits … generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal citation and quotation marks omitted); *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) ("an official capacity suit is another way of pleading an action against an entity of which the officer is an agent"). The official capacity claims accordingly are dismissed. *See Budd v. Motley*, 711 F.3d 840, 843-44 (7th Cir. 2013); *Robinson v. Sappington*, 351 F.3d 317, 339-40 (7th Cir. 2003); *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987).

### 2. Absolute Legislative Immunity

Second, the Village contends that the Trustees and Ostenburg (the Village President) enjoy absolute immunity because their alleged conduct was undertaken in a legislative capacity. Doc. 156 at 39-40. (Absolute immunity is also sought for McGann, the Village Clerk, but she is sued in her official capacity only, Doc. 159 at ¶ 7, and the official capacity claims have been dismissed.) "[A]bsolute immunity shields a legislator's conduct even when that conduct is based on improper motives. Absolute immunity, however, only applies to those legislators acting in their legislative capacity. Courts have granted absolute legislative immunity to legislators for various activities which include: (1) core legislative acts such as introducing, debating, and voting on legislation; (2) activities that could not give rise to liability without inquiry into legislative acts and the motives behind them; and (3) activities essential to facilitating or preventing the core legislative process." *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir.

1997) (internal quotation marks and citations omitted); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) ("Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity.") (internal quotation marks omitted); *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011). Therefore, "an ordinance adopted through the legislative process, and having the force of law, is covered by legislative immunity no matter the motives of those who proposed, voted for, or otherwise supported the proposal." *Benedix v. Vill. of Hanover Park*, 677 F.3d 317, 318 (7th Cir. 2012). Absolute legislative immunity does not apply to "acts that are ministerial or administrative in nature," and "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011).

Applying these principles to this case, absolute legislative immunity attaches to the Trustees' and Ostenburg's involvement in the enactment of the electricity ordinance and other provisions of the Village code. *See Biblia Abierta*, 129 F.3d at 903-04 (holding that absolute legislative immunity applies to an alderman's introducing and voting for a municipal ordinance); *Reed v. Vill. of Shorewood*, 704 F.2d 943, 952-53 (7th Cir. 1983) (same); *see also Bagley*, 646 F.3d at 393 ("legislative immunity attached to a county executive's role of transmitting a budget from the department of public works to the county board, which enacted the budget") (citing *Nisenbaum v. Milwaukee Cnty.*, 333 F.3d 804, 808 (7th Cir. 2003)) (internal quotation marks omitted). Absolute immunity also applies to the alleged failure to bring to a vote Thorncreek's petition for a conditional use permit for the leasing office in Area G. *See Biblia Abierta*, 129 F.3d at 905-06 (holding that absolute legislative immunity covers the defendant aldermans' requests to postpone a zoning hearing). The Village itself does not and could not seek immunity

-33-

for either of these actions. *See Capra v. Cook Cnty. Bd. of Review*, __ F.3d __, 2013 WL 4441929, at *4 (7th Cir. Aug. 21, 2013) (municipalities do not have absolute legislative immunity even where municipal officers do); *Reed*, 704 F.2d at 953 ("the municipality's liability for [the] acts [of municipal policymakers] extends to acts for which the policy-making officials themselves might enjoy absolute immunity because the acts were legislative or judicial in character"). And Mick and Kerestes do not seek absolute immunity for their role in those legislative activities, although the argument might have been available to them. *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 471 (4th Cir. 2012) (holding that absolute legislative immunity protected from liability the county executive for submitting a budget to the county council and the county fire chief for giving allegedly misleading testimony to the council regarding the budget).

Absolute legislative immunity does not protect the Trustees or Ostenburg to the extent they are sued for their involvement in the discriminatory enforcement of the electricity ordinance or other Code provisions. *See Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988) (holding that "[a]bsolute immunity … only applies to those legislators acting in their legislative capacity. Administrative or executive acts of legislators are not protected."); *see also Alexander v. Holden*, 66 F.3d 62, 65 (4th Cir. 1995) (same). The Village contends that the Trustees did not have sufficient involvement in enforcing municipal law against Thorncreek to justify holding them liable. Doc. 156 at 40. That is a merits argument, not an immunity argument. And it fails as a merits argument, at least on summary judgment, because the record includes facts sufficient to allow a reasonable jury to conclude that the Trustees had the requisite level of involvement in the Village's alleged misconduct to support liability against them.

### 3.     Qualified Immunity

Third, the Village argues that the individual defendants are entitled to qualified immunity.  Doc. 156 at 40-42.  Because the takings and due process claims have been dismissed, it is necessary to consider qualified immunity only as to the federal equal protection and §§ 1985 and 1986 claims.  "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Ibid.*

Stripped of its boilerplate, the Village's entire discussion of qualified immunity consists of these two sentences, which track the two questions just referenced: "For reasons set forth within this memorandum of law, the Defendants maintain that the Plaintiffs have failed to show a violation of a constitutional right.  Further, existing law for plaintiffs' various constitutional claims is not clearly established with respect to the alleged wrongdoing in this case."  Doc. 156 at 41-42.  The first sentence is wrong; as shown in Section II.A, *supra*, Thorncreek has adduced evidence sufficient to show that the Village violated its equal protection rights.  The second sentence states a conclusion without providing reasoning or authority, so the Village's argument on the "clearly established" prong of qualified immunity is forfeited.  *See Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 822 (7th Cir. 2011) (where the party "cited no relevant legal authority to the district court to support the proposition … the argument is waived").

-35-

Qualified immunity would have been denied even putting aside forfeiture. It has been settled law for decades that the Equal Protection Clause bars government action aimed at restricting the housing choices of racial minorities or targeting those who provide housing to racial minorities. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-52 (1970) ("Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way to compel or encourage racial segregation."); *Shelley v. Kraemer*, 334 U.S. 1, 20-21 (1948); *Young Apartments*, 529 F.3d at 1039-46 (citing cases); *Scott*, 716 F.2d at 1415-17 (citing cases); *Des Vergnes*, 601 F.2d at 17 (citing cases). Likewise, it has long been settled that government action aimed at rank "racial balancing" is unconstitutional. *See Grutter*, 539 U.S. at 330; *Hearne*, 185 F.3d at 775. It is true that the standard governing class-of-one equal protection claims is unsettled in the Seventh Circuit, *see Bond v. Atkinson*, __ F.3d __, 2013 WL 4511469, at *3 (7th Cir. Aug. 26, 2013), but that does not warrant qualified immunity on Thorncreek's class-of-one claim because the claim survives even under the most stringent standard articulated by the various *Del Marcelle* opinions, *see Billington v. Vill. of Armington*, 498 F. App'x 572, 574 (7th Cir. 2012). Finally, while the *Village of Arlington Heights* dictum referenced above might possibly indicate that a corporation's ability to press a race-based equal protection claim is not clearly established, the Seventh Circuit has squarely held in materially identical circumstances that "uncertainty as to the eventual plaintiff's standing to bring suit, no matter how objectively reasonable at the time of the conduct in question, cannot be the basis for qualified immunity." *Triad Assocs.*, 10 F.3d at 498-99; *see also Kurowski v. Krajewski*, 848 F.2d 767, 774 (7th Cir. 1989) ("The Constitution creates rules that apply to all governmental

actors, however, no matter what judges will do to implement them. In some cases no one will have standing to sue. There is nonetheless a rule of law, which all parts of the government must observe.") (internal citation omitted).

**Conclusion**

For the foregoing reasons, Thorncreek's summary judgment motion is denied and the Village's summary judgment motion is granted in part and denied in part. All official capacity claims against the individual defendants are dismissed, as is the ICRA claim against the individual defendants. McGann is terminated as a party defendant because she has been sued only in her official capacity. The Trustees and Ostenburg are immune for any liability for their role in enacting municipal ordinances. Defendants are granted summary judgment on the state and federal due process and takings claims. Subject to the foregoing limitations, Thorncreek's federal and state equal protection claims, conspiracy claims under 42 U.S.C. §§ 1985 and 1986, and ICRA claim will proceed to trial.

September 30, 2013

_____
United States District Judge